# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| **In re Teflon Products Liability Litigation, MDL NO. 1733** | : : : | **CASE NO.:  4:06-cv-00157-REL-CFB** |
| CONSTANCE A. WEBB, individually and on behalf of all similarly-situated consumers, | | Previous Case No. 05-72923 (USDC ED MI) Hon. Nancy G. Edmunds |
| Plaintiff, v. | | **SECOND AMENDED COMPLAINT -CLASS ACTION-** |
| E.I. DUPONT DE NEMOURS & COMPANY, | | |
| Defendant. | | |

## CLASS ACTION SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND EQUITABLE  RELIEF AND RETENTION OF JURISDCTION TO AWARD ACTUAL DAMAGES
### (Jury Trial Demanded)

Class Representative Plaintiff, CONSTANCE A. WEBB, on her own behalf and on behalf of all other similarly-situated consumers, hereby files this Class Action Complaint for Injunctive and Monetary Relief against Defendant, E.I. DUPONT DE NEMOURS & COMPANY ("DuPont"), and alleges:

## I.  INTRODUCTION

1.      This is a class action seeking monetary and other relief arising from DuPont's deceptive and unfair trade practices in failing to disclose to the consuming public the potential for serious public health, safety and welfare issues resulting from its manufacture and sale for over fifty (50) years of a product commonly known as "Teflon."  Cooking products containing

Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans.

2.      DuPont manufactured and distributed Teflon when it knew or should have known that Teflon contains substances that were dangerous and harmful to the public that can be released when cooking products made with Teflon are used for their intended purposes.

3.      This action is brought against DuPont for (1) a declaration that the trade practices alleged in this Second  Amended Complaint are unlawful and for the issuance of an injunction enjoining those practices found to be unlawful; (2) a declaration of each consumer's right to elect to set aside those transactions and an order requiring DuPont to make restitution and disgorgement of the costs and profits earned as the result of the unlawful practices;  (3)  an order providing for notice to the Class once the parties rights and liabilities are adjudicated by the Court; (4) an order requiring DuPont to provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon; (5) an order of the Court retaining jurisdiction thereafter for consumer Class Members who elect to seek actual damages not incidental to equitable relief. (6) reasonable attorney fees;  and, (7) costs associated with bringing this action;

## II.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different States.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Michigan.

6.      This court has diversity jurisdiction over DuPont pursuant to 28 U.S.C. §1332(c) because Constance Webb is a citizen of the State of Michigan and DuPont is incorporated and has its principal place of business in the State of Delaware.

## III.

## REPRESENTATIVE CLASS PLAINTIFF

7.      Plaintiff, CONSTANCE A. WEBB ("WEBB"), is a resident of Oakland County, Michigan and is a consumer of cooking products containing or made with DuPont Teflon product.  At all relevant times, Webb purchased and/or continued to use for herself and her family cooking products containing or made with DuPont's Teflon product, and still owns these products.

## IV.

## DEFENDANT

8.      DuPont is a Delaware corporation.  DuPont sells or distributes Teflon throughout the State of Michigan.

9.      DuPont is in the business of manufacturing and supplying Teflon for distribution, marketing, wholesaling and retailing in various products made for consumer use.  Included among these products are housewares, household appliances, and cooking products such as pots and pans.

10      Defendant DuPont is subject to the jurisdiction of this Court because it is engaged in substantial business in the State of Michigan.

## V. BACKGROUND AND GENERAL ALLEGATIONS

11.     DuPont was founded in 1802.

12.     DuPont operates in more than seventy (70) countries.

13.     Teflon was invented in 1938 at DuPont's Jackson Laboratory.

14.     Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

15.     DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

16.     As DuPont proudly boasts in its Teflon website:

17.     Teflon is really everywhere.  Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

18.     Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

19.     Teflon and the chemicals used in its production represent a $2 billion per year industry.

20.     DuPont nets an estimated $200 million per year from its sale of Teflon.

21.     DuPont has advertised and represented to the public that Teflon makes life easy, and reportedly has called Teflon a "housewife's best friend."

4

22.     DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon enhances consumer recognition.

23.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers.  DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon can be harmful to human health.

24.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon.  PFOA is also sometimes referred to by DuPont as C-8.

25.     PFOA is the chemical used to give Teflon its "non-stickiness."

26.     PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

27.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

28.     PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

29.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

30.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

31.     DuPont has conducted both animal and human studies and tests on PFOA.

32.     DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cooking products coated with Teflon and has denied that the use of cooking products coated with Teflon can be harmful to human health.

33.     In 1981, however, 3M, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals.

34.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees employed at the plant where PFOA is manufactured.  This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

35.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

36.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby.  Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

37.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans and

further failed to disclose to the EPA the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

38.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

39.     More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

40.     The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

41.     Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA.

42.     Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

43.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

44.     DuPont's concealment of its 1981 blood sample study information may well have altered the continued commercialization of Teflon and the profits received by DuPont from its

sale of Teflon.  As the EPA pointedly states in its complaint against DuPont contending that

DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not

reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

45.     DuPont has settled the claims brought by the EPA claiming it violated the Federal

Toxic Substances Control Act.

46.     In May, 2005, however, a federal grand jury from the Justice Department's

Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

47.     There are numerous additional facts and studies that demonstrate that exposure to

PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage, and other

negative health effects in tests on laboratory animals.  For example, male and female rats and

mice have developed several different kinds of tumors when exposed to PFOA.

48.     Various studies have confirmed that exposure to PFOA causes or may cause

vascular disease.  For example, it is reported that workers exposed to PFOA at 3M's plant in

Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from

cerebrovascular disease. Findings of vascular disease have also been reported in a study of

DuPont workers exposed to PFOA.  Additionally, DuPont's study of the blood of its workers

demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly,

there was also a statistically significant correlation between cholesterol and PFOA found in a

study of Italian workers exposed to PFOA.  Moreover, there are animal studies showing changes

in blood chemistry associated with PFOA exposure that bolster these human study results.

49.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.   For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.   Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.   Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

50.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA.   Some of these studies include:

**(a)**     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989.   Additionally, a general mortality study found an increase in leukemia.

**(b)**     Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.   An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

**(c)**     At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)     At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

51.     Over 40 years ago, DuPont conducted human experiments with Teflon-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became sick.  In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing.  These symptoms are commonly linked to Polymer Fume Fever.  DuPont acknowledges that Teflon fumes can sicken people, causing Polymer Fume Fever.

52.     Moreover, apparently aware of the adverse effects in humans of inhaling heated Teflon, DuPont required its employees to wear respirators when working with Teflon heated to 400 F (or more) while in poorly ventilated areas.  Experiments demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this temperature within 2 minutes using a conventional stove top burner set on high.

53.     Reports indicate that a Teflon coated pan reached 721ºF in just five minutes under the same test.  DuPont studies show that Teflon emits toxic particulates at 446 F.  At 680 F Teflon coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000ºF), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

54.     For the past fifty years DuPont has claimed that their Teflon coatings do not emit hazardous chemicals through normal use.  In a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C).  These temperatures alone are well above the normal cooking range."

Reported tests show, however, that Teflon coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.  The toxic particles and gases emitted when Teflon heats and the temperatures at which these particles and gases are first emitted, follow:

464ºF – Ultrafine particulate matter:  Teflon produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680ºF – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.  In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles.  Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia*)*, discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932ºF – Carbonyl fluoride (COF2): Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure. Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932ºF – Hydrogen fluoride (HF): Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112ºF – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112ºF – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

55.     The EPA has recently identified significant human health concerns from exposure to PFOA.

56.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

57.     A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans. The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**. According to the EPA's Guidelines for Carcinogen Risk

Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

58. DuPont executives nonetheless continue to claim that the use of Teflon in cooking products is completely safe.

# VI

## <u>CLASS ACTION ALLEGATIONS</u>

59.     The Representative seeks only declaratory, injunctive, and equitable relief on behalf of the Class, to adjudicate: defendant's liability for its deceptive and unfair trade practices; the class' entitlement to elect rescission, restitution, disgorgement remedies; and/or actual damages incidental to equitable relief; the provision of class notice once the parties' rights and liabilities are adjudicated by the Court; and secure other related forms of equitable relief as described in paragraph 3 of this Second Amended Complaint.

60.     Consequently, a class action is appropriate pursuant to Fed. R. Civ. P. 23 (a),23(b)(1)(A) and (B), and Rule 23(b)(2).

61.     However, after that notice process, to the extent more than 100 class members affirmatively elect instead to seek actual damages not incidental to equitable relief, plaintiffs ask the Court retain jurisdiction to determine at that time whether additional certification pursuant to Rule 23(b)(3) would be necessary or appropriate as to the group of those so electing.

62.     The class represented is composed of all persons who, for purposes of both Counts are  within the State of Michigan came into ownership for personal, family, or household use, whether by sale, lease, assignment, award by chance, gift or other transfer, of a cooking product(s) made with or containing Teflon and are currently in possession of the product.

For purposes of Count II (unjust enrichment), a sub-class meeting the same definition except limited to consumers who purchased the products or otherwise paid money for its use or ownership should be approved.

14

63.     The size of these Classes is currently unknown but each is estimated to be in excess of 1,000,000 consumers.

64.     DuPont has knowledge of all licensees authorized to manufacture or sell cookware made with or containing Teflon and the brand and model names so marketed.  Upon information and belief, and subject to information obtainable only through pretrial discovery, DuPont licensed the use of Teflon to, among others, the following manufacturers and models of cookware:

| MFG. | MODELS |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Anolon | Anolon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Crestware | Dupont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra |

|  | Silverstone Professional |
|---|---|
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Plantinum Pro<br>Platinum Select<br>Xtra<br>Classic |
|  |  |
| Farberware | Farberware, Inc.<br>Farberware Millennium<br>Farberware Nonstick Aluminum<br>Restaurant Pro<br>Enhanced Nonstick Cookware<br>Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
| GAU |  |
| GSI Outdoors | Bugaboo |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar |  |
| Salton |  |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |

| US Foodservice | Next Day Gourmet |
|----------------|------------------|
| Wearever | Mirro |
|  | Regal |
|  | Wearever |

65.     The persons in these Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

66.     There is a well-defined commonality of interest regarding the questions of law and fact affecting the Class.  Questions of law and fact common to the Class, among others, are:

a.     Whether DuPont made, approved, allowed, or ratified representations in Michigan through mass marketing and product-specific advertising that Teflon or the use of Teflon coated cooking products was safe, healthful, or that use of Teflon coated cooking products was more healthful than use of non-Teflon coated cooking products.

b.     Whether DuPont's mass marketing and product-specific advertising in Michigan that Teflon or the use of Teflon coated cooking products was safe, healthful, or that use of Teflon coated cooking products was more healthful than use of non-Teflon coated cooking products, would cause a reasonable person to believe the ordinary use of Teflon coated cooking products entailed no potential human health risk.

c.     Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont possessed or relied upon a reasonable basis in fact (such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence) substantiating representations that Teflon or the use of Teflon coated cooking products was safe, healthful, and entailed no potential human health risks.

d.      Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont knew or should have known that the release of substances during the ordinary and foreseeable use of Teflon coated cooking products could not medically or scientifically be said, to a reasonable degree of professional certainty, to entail no potential human health risks.

e.      Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont had in its possession animal or human test data indicating potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

f.      Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont had knowledge or possession of blood sample test results of its workers indicating transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

g.      Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

h.      Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont had in its possession information demonstrating or tending to demonstrate that one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products does present potential risk of injury to human health.

i.     Whether during the time of such mass marketing and product-specific advertising in Michigan, DuPont had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

j.     Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

k.     Whether the representations in DuPont's mass marketing and product specific advertising in Michigan, that Teflon or the use of Teflon coated cooking products was safe, healthful, or more healthful than use of non-Teflon coated cooking products, were qualified or unqualified.

l.     Whether at the time of such mass marketing and product-specific advertising in Michigan, DuPont disclosed, in a fashion sufficiently specific so as to leave no reasonable probability of misunderstanding, clearly, conspicuously and in close proximity to its affirmative representations, any and all material exclusions, reservations, limitations, modifications, or conditions relevant to the affirmative representations that Teflon or the use of Teflon coated cooking products was safe, healthful, or more healthful than use of non-Teflon coated cooking products.

m.     Whether DuPont's mass marketing and product-specific advertising  in Michigan affirmatively represented that Teflon or the use of Teflon coated cooking products was safe, healthful, or more healthful than use of non-Teflon coated cooking products, when DuPont knew or should have known those representations would justifiably induce class members to

choose, retain, and/or continue use of Teflon coated cookware, or to refrain from choosing and using other cookware, due to DuPont's failure to disclose - knowingly, with scienter, and/or through a failure to exercise reasonable care - what it actually knew, and actually did not know, about the truth or falsity of those representations, thus, rendering those representations untrue, deceptive, or misleading, to the injury of class members.

n.     Whether the Representative's claim is sufficiently similar to the claims of prospective class members.

o.     The types of equitable and injunctive relief to which the class members may be entitled to for deceptive and unfair trade practices under MCL §445.901, et. seq and the common law.

67.     These common questions of law and fact are governed by the laws of the State of Michigan, where Defendant has engaged in its wrongful conduct.

68.     The claim of the Representative is typical of those of the Classes.     The Representative is committed to the vigorous prosecution of this action and has retained competent counsel experienced in this litigation of this nature to represent them.     The Representative anticipates no difficulty in the management of this litigation as a Class Action. Accordingly, the Representative is an adequate representative of the Classes and will fairly and adequately protect the interests of the Classes.

69.     A class action is the best available method for the fair and efficient adjudication of this controversy.   The Members of the Classes are so numerous that the joinder of all Members is impracticable, if not impossible.   Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Classes to seek redress individually

20

for the wrongful conduct alleged herein.  Should each individual Member of the Classes be required to bring separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants.  The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

70.    To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been waived.

## COUNT I

### UNFAIR AND DECEPTIVE TRADE PRACTICES
### UNDER THE MICHIGAN CONSUMER PROTECTION ACT

71.    Plaintiff realleges and reincorporates the allegations contained in paragraphs 1 through 71 above as if fully set forth herein.

72.    This claim is brought pursuant to MCL §445.901 *et. seq*., commonly referred to as the Michigan Consumers Protection Act ("MCPA").

73.    The Class Representative Plaintiff and Class Members are consumers of personal, family or household products manufactured and sold by DuPont and covered by the MCPA, MCL §445.902(d)

74.    DuPont has engaged in deceptive and unfair acts or practices in the conduct of its business, which acts are unlawful pursuant to MCL §445.903(1)(e)(s)(bb) (cc).

75.    DuPont has committed a willful violation of the MCPA and is not entitled to the "bona-fide error" protection of MCL §445.911(6).

76.     DuPont is not entitled to any exemptions under the MCPA including the exemption found at MCL §445.904 because the unfair and deceptive practices alleged in this lawsuit were not specifically authorized under laws administered by a regulatory board of officers acting under statutory authority of this state of the United States.

77.     DuPont knew or should have known that Teflon  emissions from heating were or are potentially harmful to consumers, can not be said to pose no risk to human health given the medical and scientific evidence within DuPont's knowledge, and are not without risks to human health for all uses or conditions associated with personal, family, and household use.

78.     DuPont knowingly advertised that products containing Teflon were safe and without risks to consumers and their families without stating all material conditions, limitations, exclusions, and qualifications applicable thereto clearly, conspicuously, and in close proximity to those representations.

79.     DuPont knowingly made false representations to the Class that products containing Teflon were safe and not potentially harmful to the Class despite what it knew of and concealed about the adverse effects of chemicals contained in Teflon demonstrated in animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon, and the information it knew of regarding the occurrence of birth defects in the children of its female workers .

80.     DuPont knew that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive customers into using and purchasing products containing Teflon.

81.    DuPont has stated repeatedly that both Teflon and PFOA are "safe" products for consumer use without the necessary substantiating medical and scientific evidence.

82.    DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.   This fact implies that DuPont is aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon and with PFOA.

83.    A reasonable person would have relied on DuPont's unfair and deceptive trade practices as alleged in this lawsuit.

84.    As a direct and proximate result of the foregoing, the Class Representative Plaintiff and other Consumer Class members have suffered a legally-cognizable injury in violation of the MCPA, and are entitled to all the relief provided in MCC §445.911.  No claim is made for any bodily injuries or emotional distress.

WHEREFORE, plaintiff and the members of  the Consumer Class request:    (1) A declaration that the trade practices alleged in this Second Amended Complaint are unlawful and the issuance of an injunction enjoining those practices found to be unlawful; (2) a declaration of each consumer's right to elect to set aside those transactions and an order requiring DuPont to make restitution and disgorgement of the costs and profits earned as a result of the unlawful practices and; (3) a provision for notice to the class once the parties' rights and liabilities are adjudicated by the Court;  (4) an order of the Court retaining of jurisdiction thereafter for those consumer Class members who elect to seek actual damages not incidental to equitable relief; (5) an order requiring that DuPont provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon; and, (6)  costs associated with bringing this action, (5) reasonable attorney fees,

## COUNT II

## UNJUST ENRICHMENT

85.     Plaintiff realleges and reincorporates the allegations contained in paragraphs 1 through 84 as fully set forth herein.

86.     Plaintiff and members of the consumer Class conferred a benefit upon DuPont when it purchased or otherwise paid money to acquire ownership of Teflon-coated cooking products.

87.     DuPont, at all times relevant to this matter, was fully aware that Plaintiff and members of the Class were conferring upon it benefits by paying money for Teflon-coated cookware.

88.     DuPont, at all times relevant to this matter, has accepted and retained the benefit conferred by Plaintiff and Class members.

90.     DuPont, by virtue of its unlawful trade practices as described in Count I, created circumstances such that it would be inequitable for DuPont to retain the benefit conferred by Plaintiff and Class members without providing Plaintiff with a product of fair value or the financial equivalent of same.

91.     As a direct and proximate result of the foregoing, DuPont has been unjustly enriched and should be required to provide Plaintiff and Class members with appropriate relief which is available as a remedy for its unlawful conduct.

WHEREFORE, Plaintiff and the members of the consumer Class request all the relief which is available as a remedy for unjust enrichment.

## JURY DEMAND

Plaintiff, Constance A. Webb, individually and on behalf of all similarly-situated consumers, by and through her attorneys, hereby demands a trial by jury of all issues to the within cause of action.

PITT, DOWTY, MCGEHEE, MIRER & PALMER, P.C.
*Counsel for Plaintiff*
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Telephone:     (248) 398-9800


KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
*Counsel for Plaintiffs*
Miami Center, 17th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:     (305) 379-9000
Facsimile:     (305) 379-3428


Kimberley K. Baer      PK0014675
Steven P. Wandro       PK0008439
WANDRO, BAER & APPEL, P.C.
*Counsel for Plaintiffs*
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:     515/281-1475
Facsimile:     515/281-1474


By:    s/ Kimberley K. Baer
           Kimberley K. Baer, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via Electronic Mail and a true and correct copy of the Certificate of Service (only) furnished via U.S. Mail to:  **Adam L. Hoeflich, Esq.**, (adam.hoeflich@bartlit-beck.com) Bartlit Beck Herman Palenchar & Scott LLP, 54 W. Hubbard Street, Chicago, IL 60610l; **Robert Fanter, Esq.**, (fanter@whitfieldlaw.com) Whitfield & Eddy 317 Sixth Avenue, Suite 1200, Des Moines, Iowa 50309 and **John Sherk, Esq.**, (jsherk@shb.com) Shook Hardy & Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108  this 8th day  of May 2006.


By:                  s/ Kimberley K. Baer
                    Kimberley K. Baer, Esq.